UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO  DIVISION

| | | |
|---|---|---|
| RICHARD PENA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: SA-08-CV-1016-XR |
| | ) | |
| BEXAR COUNTY, TEXAS, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ORDER**

On this date, the Court considered Defendants' Motion for Summary Judgment (docket no. 34), and Plaintiff's response in opposition.

**I. Procedural Background**

After being arrested at the Bexar County Courthouse, Plaintiff Richard Pena filed this lawsuit against Bexar County and certain individual Bexar County Officers ("Individual Defendants"), seeking compensatory and punitive damages and permanent injunctive relief.  Specifically, Plaintiff alleges that Bexar County discriminated against him in violation of Title II of the ADA (Count I); that all Defendants violated his federal statutory rights ( the ADA) and constitutional rights (Fourth and Fourteenth Amendments) while acting under color of state law, in violation of 42 U.S.C. § 1983 (Count II); a direct claim against all Defendants for violations of the Fourteenth Amendment (Count III); a direct claim against all Defendants for violations of the Fourth Amendment (Count IV); state-law claims against the Individual Defendants for intentional infliction of emotional distress (Count V), assault (Count VII), false imprisonment (Count VIII), and malicious prosecution (Count IX); and state-law negligent training and supervision claims against Bexar County (Count VI).

1

Bexar County previously filed a motion to dismiss under Texas Civil Practice and Remedies Code § 101.106(e), and the Court has accordingly dismissed all the state-law claims against the Individual Defendants.  Docket no. 39.  Accordingly, those portions of Defendants' motion for summary judgment addressing Counts V, VII, and VIII are DISMISSED AS MOOT.

In addition, the Court notes that Counts III (Fourteenth Amendment) and IV (Fourth Amendment) are duplicative of Plaintiff's claim under Section 1983 and fail to state a claim. Because Plaintiff's remedy for violation of his federal constitutional rights by persons acting under color of state law is through Section 1983 rather than through a direct action under the Constitution, the Court will *sua sponte* summarily dismiss Count III and Count IV.  *See Gray v. Maryland*, 228 F. Supp. 2d 628, 638-39 (D. Md. 2002); *see also Chase v. City of Portsmouth*, 2005 WL 3079065 (E.D. Va. Nov. 16, 2005) ("[A] plaintiff must use Section 1983 as a vehicle to enforce causes of action implied directly from the Constitution.").

Thus, Plaintiff's remaining claims are Count I (violation of the ADA by Bexar County), Count II (Section 1983 claims against all Defendants for violation of the ADA, Fourth Amendment, and Fourteenth Amendment), and Count VI (state-law negligent training and supervision claims against Bexar County). Defendants now move for summary judgment on Counts I and II.

## II. Summary Judgment Standard

Summary judgment is appropriate if the summary judgment evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Mello v. Sara Lee Corp*., 431 F.3d 440, 443 (5th Cir. 2005); Fed. R. Civ. P. 56.  The Court reviews the evidence and inferences to be drawn therefrom in the light most favorable to the non-moving party.  *FDIC v. Laguarta*, 939 F.2d 1231, 1236 (5th Cir. 1991).

If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit credible evidence that negates the existence of some material element of the opponent's claim or defense, or (2) demonstrate that the evidence in the record insufficiently supports an essential element or claim. *Id.* If the moving party meets its initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006). The nonmoving party, however, cannot satisfy this burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. *Id.*

### III. Factual Background/Summary-Judgment Evidence

Plaintiff submits his sworn Declaration in support of his Response to the Motion for Summary Judgment. The affidavit recites the following facts:

Plaintiff asserts that he is a qualified individual with a disability as a result of a stroke in 1998 that has affected his sight, balance, and mobility, and that he relies on a service animal, a 90-pound Akita named Prissy. On July 23, 2007, Plaintiff visited the Bexar County Courthouse to conduct research on his adoption, and was accompanied by his service dog. Plaintiff asserts that one of the security officers posted at the metal detector located at the entrance detained him and refused to let him enter, stating that "dogs are not allowed in this building." Plaintiff informed the officer that he was disabled, that Prissy was a service animal, and that he had a right to be accompanied by his service animal into the building. The officer contacted his supervisor, and Plaintiff was delayed for approximately fifteen minutes until the supervisor arrived. Plaintiff asserts that he asked if he could sit on a nearby bench until the supervisor arrived, but was told to remain standing. Plaintiff states that, because he has difficulty maintaining balance, this amount of time "seemed absolutely interminable." When the supervisor arrived, Plaintiff explained about his disability and his need to

be accompanied by his service dog.  The supervisor then questioned Plaintiff about the exact nature

of his disability and demanded proof that Prissy was a service animal.  Plaintiff states that,

fortunately, he had with him a document from the Social Security Administration that verified his

disability and stated that he had a service dog.  After reviewing the document, the supervisor

allowed Plaintiff to enter the building, and Plaintiff proceeded to the third floor of the building to

do his research.

Plaintiff asserts that, approximately thirty minutes later, while he was in the Adoptions

Office, Defendant Brian Stanford "stuck his head in the door" and said, "Oh there you are.  We've

been looking for you."  The parties offer differing accounts of what transpired next.  On summary

judgment, the Court must accept Plaintiff's factual allegations as true.  Plaintiff states that Stanford

then said that dogs were not allowed in the Courthouse, to which Plaintiff responded that Prissy was

a service animal and that federal law allowed him to bring her in the building.  Stanford then asked

Plaintiff if he was blind, to which Plaintiff responded that he was not, but that he was disabled, and

that his disability required him to use a service animal.  Plaintiff alleges that Stanford then stated

that, "[a]fter 9/11 the only service animals allowed in the Courthouse are for blind people."  Plaintiff

alleges that Stanford "ordered [him] to leave the building," but Plaintiff stood his ground and said,

"I'm entitled to be here just like anybody else and I'm not going anywhere."  Plaintiff states that,

in response, Stanford said that, if Plaintiff did not leave the building, he would be arrested and

charged with trespassing.  Plaintiff then stated, "You will have to arrest me because, like I said, I'm

entitled to be in this building just like everybody else.  I'm not leaving."  Stanford then "grabbed

[Plaintiff's] left hand in order to handcuff and arrest [him] . .  and forcibly dragged [Plaintiff] into

the hallway where he was met by another Sheriff's Deputy, Defendant Humberto Hernandez."

Hernandez grabbed Plaintiff's right arm, which is paralyzed, and twisted it, and then Plaintiff was handcuffed. Plaintiff alleges that Defendants then picked him up by his arms, which were handcuffed behind his back, and carried/dragged him down the hallway. Plaintiff alleges that, because of his right-arm paralysis, the force used by Defendants caused him excruciating pain. Defendants deny dragging Plaintiff into or down the hallway. Defendants also contend that the amount of force used was appropriate, and assert that Plaintiff would not let go of Prissy's leash, and was effectively choking Prissy.[1]

---

[1] Deputy Hernandez states that, when they located Plaintiff at Gwen Jacob's office on the third floor, Plaintiff was seated with his dog at his side. Hernandez states that "Officer Stanford asked Plaintiff if he was blind and if the dog was his service animal" and "Mr. Pena said, 'No.'" Hernandez states that "Officer Stanford asked Mr. Pena, what if any was his disability" and "Mr. Pena stated, 'I am mobility impaired. This is my service dog. Federal law allows me to take the dog any where I go.'" According to Hernandez, Stanford asked Plaintiff for any document designating his dog as a service animal and for some type of identification, to which Plaintiff responded, "I don't need to show you a f**king thing. Look it up, it's on the internet, Federal law" and slammed his left hand on the table in front of him. Hernandez states that Plaintiff "was defiant many times when asked by Officer Stanford for proof of his identification and that the dog was a service dog" and Plaintiff "continually stated federal law permitted him to have the dog and that he did not have to provide identification of himself." Hernandez states that he and Stanford "felt that having a dog in the building that was not documented as a service animal was in violation of an order of the Bexar County Commissioners Court in regard to bringing animals into the Courthouse" and that "the dog could pose a danger to the public, including the children on the 3rd Floor, since it was a large animal for which we had no information about its training and could be used as a weapon." Because of this and the fact that Plaintiff "would not provide identification of himself," Hernandez states that he and Stanford asked Mr. Pena several times to leave the building. According to Hernandez, Plaintiff "refused to leave and was very defiant, aggressive and uncooperative" and stated, "You'll have to arrest me to get me out of here and you better not touch my dog." Officer Stanford then made the decision to arrest, telling Plaintiff he was under arrest and taking out his handcuffs. Hernandez states that Plaintiff then "started to resist by flailing his arms, not listening to commands, yelling at full volume and shifting his body around." Hernandez put his hand on Plaintiff's right arm on his wrist to assist Stanford in handcuffing Plaintiff. Hernandez states that this was "standard procedure,"that Plaintiff's arm "did not feel paralyzed," and that Plaintiff "resisted with strength in his arm" and "continued to move his arms back and forth." Hernandez states that he could not get Plaintiff to release the leash. Hernandez further states that they "did not drag Mr. Pena into the hallway."

Officer Stanford's incident report states that he asked Plaintiff if he was blind, and Plaintiff

Plaintiff alleges that Prissy was distressed by the events, and was dragged down the hallway. Plaintiff alleges that three other Deputies, Defendants Shawn Tobleman, Frank Stubbs III, and S. Rapier, "jumped into the fray and assisted the first two officers." Plaintiff asserts that the use of five officers to arrest a 150-pound disabled man was excessive and demonstrates their "intent to punish" him for standing up for his rights. Plaintiff alleges that Defendants threatened to shoot Prissy and threatened to send her to the County animal control facility, where she would be euthanized if not picked up in three days. Defendants deny making any such threats.

Plaintiff was charged with three separate crimes: (1) resisting arrest in violation of Texas Penal Code § 38.03; (2) criminal trespass of a building in violation of Texas Penal Code § 30.05, and (3) cruelty to animals in violation of Texas Penal Code § 42.09. Plaintiff asserts that this third charge is proof of the illegal motivations of the arrest and the Defendants' intent to harass and humiliate Plaintiff. Plaintiff asserts that "only two of these charges were dismissed by the County

---

said "no." He then asked if Plaintiff was disabled, and he said "yes." Stanford asked Plaintiff if he had any documentation to show that he was in need "of a handicap dog" and Plaintiff responded, "No, I don't have to show you shit." Stanford then said that "He needed to at least show some identification" and Plaintiff stated, "No, I won't. If you want me to leave, you'll have to arrest me." In contrast to Deputy Hernandez's affidavit, Deputy Stanford states that "Mr. Pena never indicated to me that he needed a service animal or that the dog was a service animal." Stanford further states, "I never told or represented to Mr. Pena that he needed to 'prove' that his dog was a service animal. I did ask for information that indicated that the dog was a service animal. I then told Mr. Pena that he needed to at least show some identification for himself. Mr. Pena stated, 'No, I won't. If you want me to leave, you'll have to arrest me." Stanford states that he "did not threaten Mr. Pena with arrest. He was the one who initiated the issue of arrest." Stanford further states that he asked Plaintiff to accompany him to the offices of Court Security to speak with Lt. Lorenz, but Plaintiff "would not cooperate" and instead "slammed the table in front of him and started yelling" and "wrapped his arm around the dog's leash and started lifting the dog up off the ground," choking him. Stanford states that he and Hernandez then told Plaintiff to let go of the leash, and at that point he "decided to handcuff Mr. Pena because he was wrapping the leash around his arm, he was choking the dog and we were unsure what he planned to do."

6

Court."  However, elsewhere he acknowledges that all three charges were eventually dismissed.[2] Defendants assert that all three charges were dismissed on July 26, 2007.  Docket no. 34 at 14-15. Plaintiff states that, as a consequence of having to appear for arraignment on the criminal charges, he had to report to the criminal court, and has been repeatedly detained and threatened because of his service dog.

## IV. Analysis

### A. Title II of the Americans with Disabilities Act Claim

#### 1. Plaintiff's allegations

Plaintiff alleges that Bexar County violated Title II of the ADA by: (1) Representing that the ADA limits the work a service animal can perform by insisting that the ADA applies only to seeing eye dogs; (2) Representing that the ADA mandates that service animals be specifically identified with certification papers, a harness, special collar, or any other form of identification; (3) Representing that the ADA allows Individual Defendants to ask specific questions about Plaintiff's disability; (4) Detaining Plaintiff at the security entrance to the Bexar County Courthouse for a period of at least 15 minutes while the security officers cross-examined Plaintiff (including asking questions that the ADA specifically precludes such as inquiring about the exact the nature of his disability); (5) Detaining Plaintiff at the security entrance to the Bexar County Courthouse for a period of at least 15 minutes while the officers at the entrance to the security gate requested assistance from their supervisor; (6) Detaining Plaintiff after he had received clearance to enter the

---

[2] In his Complaint, he asserted on information and belief that only two of the charges were dismissed, but that the resisting arrest charge was not, and that it had proceeded through Municipal Court rather than County Court.  Westlaw records indicate that the cruelty to animals and resisting arrest charges were dismissed for insufficient evidence on July 26, 2007, and the criminal trespass charge was dismissed for insufficient evidence on July 30, 2007.

Bexar County Courthouse and while he was being assisted by another Courthouse employee for additional cross-examination including, once again, asking Plaintiff questions which the ADA specifically forbids; (7) Misrepresenting, during Plaintiff's detention inside the Bexar County Courthouse that the ADA had been changed "after 9/11" and that the only service animals now allowed entrance into the Bexar County Courthouse were those specifically trained to assist the blind; (8) Requiring Plaintiff to produce, during Plaintiff's detention inside the Bexar County Courthouse, certification papers, a harness, special collar, or any other form of identification for his service animal; (9) Arresting Plaintiff after Plaintiff legitimately stood on his rights as a qualified individual with a disability as guaranteed by the ADA; (10) Physically abusing Plaintiff during his arrest ("six Bexar County Deputy Sheriff's forcibly dragged Plaintiff onto the floor despite the fact that Plaintiff had already informed them that he was disabled and despite the fact that this action caused considerable consternation on the part of Prissy, Plaintiff's service animal"); (11) Using excessive force during the arrest ("Plaintiff suffers, inter alia, from paralysis in his right arm. These six Deputy Sheriffs first forcibly pulled Plaintiff's right arm behind him and then pulled his left arm behind him as well. Plaintiff was placed in handcuffs with both arms behind his back (an action which caused severe and excruciating pain to Plaintiff).  Plaintiff was then picked up by his arms and dangled in this manner (thereby forcing his entire body weight onto his arms which, once again, were bound behind him) the entire distance from the Bexar County Courthouse to the Bexar County Social Justice Center"); (12) "one officer in particular made it a point to taunt Plaintiff about what would happen to Prissy . . .  This officer informed Plaintiff that Prissy would be impounded by the city's animal control facility and that, if Plaintiff was unable to recover Prissy within a few days, Prissy would be euthanized. This caused considerable distress to Plaintiff not only because Prissy

is a trained service animal worth, literally, tens of thousands of dollars but also because Prissy has been Plaintiff's constant companion for over six years."; and (13) "Unlawfully directing trumped up criminal charges against Plaintiff which had no basis whatsoever in fact or reality all for the singular purpose of needlessly harassing Plaintiff."

Plaintiff alleges that these actions were willful and intentional and that Bexar County has an "obligation and responsibility for preventing [its] agents and employees from engaging in this type of conduct."  Plaintiff asserts that Bexar County discriminated against him and failed to provide a reasonable accommodation, in violation of Title II.

2. Applicable Law

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation or denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Public entities include "[a]ny State or local government" and "[a]ny department, agency, special purpose district, or other instrumentality of a State or States or local government." 28 C.F.R. § 35.104; 42 U.S.C. § 12131(1).  Title II's enforcement provision incorporates by reference § 505 of the Rehabilitation Act of 1973, 92 Stat. 2982, as added, 29 U.S.C. § 794a, which authorizes private citizens to bring suits for money damages. 42 U.S.C. § 12133.  *Tennessee v. Lane*, 541 U.S. 509, 517 (2004); *see also United States v. Georgia*, 546 U.S. 151, 154 (2006) ("Title II authorizes suits by private citizens for money damages against public entities that violate § 12132.").

To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate: (1) that he is a qualified individual with a disability within the meaning of the ADA; (2) that he was excluded from participation in, or denied the benefits of the services, programs, or

activities for which the public entity is responsible, or was otherwise subject to discrimination by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was "by reason of" his disability. *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000); *see also Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004). "[U]nder Title II of the ADA, 'discrimination need not be the sole reason' for the exclusion of or denial of benefits to the plaintiff." *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005).

Plaintiff has offered prima facie proof that he is a qualified individual with a disability, and Defendants do not dispute this element of the claim. Plaintiff was attempting to conduct adoption research at an office housed in the County Courthouse. This qualifies as "services" under Title II. *See Frame v. City of Arlington*, 575 F.3d 432, 436 (5th Cir. 2009) (noting that "services" should be given its ordinary meaning, which is "a facility supplying some public demand"); *see also Childers v. County of York*, 2008 WL 552879 (D.S.C. Feb. 26, 2008) (noting that defendant did not dispute that the services it offered at the historic County Courthouse qualify as "services, programs or activities" for purposes of a Title II ADA claim). Plaintiff also claims that he was otherwise discriminated against by Bexar County through the actions of the individual defendants, including the delay at the entrance, improper questioning, and eventually his arrest, and that this discrimination was "by reason of" his disability.

In addition to its prohibition of disability-based discrimination, the ADA imposes upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals. *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). Title II's regulations provide that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of

disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 30.130(b)(7).  The regulations similarly state that "[e]xcept as otherwise provided in § 35.150, no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity."  28 C.F.R. § 35.149.  Further, "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."  28 C.F.R. § 35.150(a).[3]

The Justice Department, which Congress directed to issue regulations to carry out the provisions of Title III, 42 U.S.C. § 12186(b), has promulgated a regulation and commentary discussing the use of service animals in places of public accommodation. The regulation states: "Generally, a public accommodation shall modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability." 28 C.F.R. § 36.302(c)(1).  The ADA regulations under Title III further provide that "[s]ervice animal means any guide dog, signal dog, or other animal individually trained to do work or perform tasks for the benefit of an individual with a disability, including, but not limited to, guiding individuals with impaired vision, alerting individuals with impaired hearing to intruders or sounds, providing minimal protection or rescue work, pulling a wheelchair, or fetching dropped items." 28 C.F.R. § 36.104.  "There are no requirements as to the amount or type of training that a service animal must undergo, nor the type

_____

[3] 28 C.F.R. § 35, Appendix A to Part 35 (Preamble to Regulation on Nondiscrimination on the Basis of Disability in State and Local Government Services) also recognizes that "[t]he general regulatory obligation to modify policies, practices, or procedures requires law enforcement to make changes in policies that result in discriminatory arrests or abuse of individuals with disabilities."

of work or assistance that a service animal must provide, but the animal must be trained to perform

tasks or do work for the benefit of a disabled individual." *Rose v. Springfield-Greene County Health*

*Dept.*, 668 F. Supp. 2d 1206, 1214-15 (W.D. Mo. 2009) (citing *Access Now, Inc. v. Town of Jasper,*

*Tenn.*, 268 F. Supp. 2d 973, 980 (E.D. Tenn.2003)).[4]   Relying on the regulations and the DOJ's

---

[4] The DOJ's publication "Commonly Asked Questions About Service Animals in Places of Business," available at http://www.ada.gov/qasrvc.htm, states:

 The ADA defines a service animal as any guide dog, signal dog, or other animal individually trained to provide assistance to an individual with a disability. If they meet this definition, animals are considered service animals under the ADA regardless of whether they have been licensed or certified by a state or local government.

Some, but not all, service animals wear special collars and harnesses. Some, but not all, are licensed or certified and have identification papers. If you are not certain that an animal is a service animal, you may ask the person who has the animal if it is a service animal required because of a disability. However, an individual who is going to a restaurant or theater is not likely to be carrying documentation of his or her medical condition or disability. Therefore, such documentation generally may not be required as a condition for providing service to an individual accompanied by a service animal. Although a number of states have programs to certify service animals, you may not insist on proof of state certification before permitting the service animal to accompany the person with a disability.

You may exclude any animal, including a service animal, from your facility when that animal's behavior poses a direct threat to the health or safety of others. For example, any service animal that displays vicious behavior towards other guests or customers may be excluded. You may not make assumptions, however, about how a particular animal is likely to behave based on your past experience with other animals. Each situation must be considered individually.

Although a public accommodation may exclude any service animal that is out of control, it should give the individual with a disability who uses the service animal the option of continuing to enjoy its goods and services without having the service animal on the premises.

Further, DOJ's publication "ADA Business Brief" states that "[b]usinesses may ask if an animal is a service animal or ask what tasks the animal is trained to perform, but cannot require special ID cards for the animal or ask about the person's disability."  ADA Business Brief, available at http://www.ada.gov/svcabrpt.pdf.  It further states that "[a] person with a disability cannot be asked

publications, courts generally recognize that "the ADA prohibits public accommodations from requiring proof that an animal is a service animal." *See, e.g.*, *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1185 n.11 (11th Cir. 2007).

Because Bexar County is a public entity, this case is governed by Title II.  Title II and its regulations do not contain any provisions expressly concerning service animals, and Title III "expressly does not apply to public entities." *Bloom v. Bexar County, Tex.*, 130 F.3d 722, 726 (5th Cir. 1997).  Thus, Title III's regulations and DOJ interpretations related to service animals do not directly govern in a Title II case.  However, as noted by one court, "[w]hile the regulation specifically addressing service animals discusses a 'public accommodation' making the modification to allow access to a service animal, a public entity has the same legal obligation as a public accommodation to make reasonable modifications to policies or procedures to allow service animals access to facilities and places of public accommodation when necessary to avoid discrimination on the basis of disability. *See* 28 C.F.R. § 35.130(b)(7)." *Rose v. Springfield-Greene County Health Dept.*, 668 F. Supp. 2d 1206, 1215 (W.D. Mo. 2009).  Thus, even though the application of the Title III regulations and interpretations is unclear, Bexar County has an obligation to ensure that the Courthouse is "readily accessible" to qualified individuals with disabilities, and must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."

---

to remove his service animal from the premises unless: (1) the animal is out of control and the animal's owner does not take effective action to control it (for example, a dog that barks repeatedly during a movie) or (2) the animal poses a direct threat to the health or safety of others." *Id.*

In the Title III context, which contains parallel language to Title II, the Fifth Circuit has clarified the burdens of proof:

> The plaintiff has the burden of proving that a modification was requested and that the requested modification is reasonable. The plaintiff meets this burden by introducing evidence that the requested modification is reasonable in the general sense, that is, reasonable in the run of cases. While the defendant may introduce evidence indicating that the plaintiff's requested modification is not reasonable in the run of cases, the plaintiff bears the ultimate burden of proof on the issue.  If the plaintiff meets this burden, the defendant must make the requested modification unless the defendant pleads and meets its burden of proving that the requested modification would fundamentally alter the nature of the public accommodation.  The type of evidence that satisfies this burden focuses on the specifics of the plaintiff's or defendant's circumstances and not on the general nature of the accommodation. Under the statutory framework, such evidence is relevant only to a fundamental alteration defense and not relevant to the plaintiff's burden to show that the requested modification is reasonable in the run of cases.

*Johnson v. Gambrinus Co/Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997) (discussing modification of no-dog policy at brewery).   At least in the Title III context of public accommodations, the Court has found that the modification of a public accommodation's blanket no animals policy to allow full access for a guide dog is "generally reasonable," as indicated in the Justice Department's regulation and commentary.  *Id.*

When a public entity defendant fails to meet its affirmative obligation to make reasonable accommodations, the cause of that failure is irrelevant. *Bennett-Nelson*, 431 F.3d at 454-55.  Rather, in lieu of a such an inquiry, the court must determine whether the requested accommodation was "reasonable"-that is, whether it would "fundamentally alter the nature of the service, program, or activity."  *See id.* at 455 n.12.  Thus, the Fifth Circuit has stated that, when the allegation is failure to accommodate, the question is not "whether the denial of the accommodation to that disability was caused solely or only in part by the animus of the defendants" but is "whether the failure to accommodate the disability violates the ADA; and the existence of a violation depends on whether

14

under both the Rehabilitation Act and the ADA, the demanded accommodation is in fact reasonable and therefore required.  If the accommodation is required the defendants are liable simply by denying it." *Id.* at 455; *see also Benavides v. Laredo Med. Ctr.*, Civ. A. No. L-08-105, 2009 WL 1755004 (S.D. Tex. June 18, 2009) (intentional failure to provide a reasonable accommodation is a violation of the Act).

In *Delano-Pyle v. Victoria County, Texas*, 302 F.3d 567 (5th Cir. 2007), the Fifth Circuit held that the ADA, unlike section 1983, does not require a policy, custom, or practice of discrimination by a public entity, and instead contemplates *respondeat superior* liability for the public entity based on the actions of its employees and agents.  The Court noted that

> The ADA expressly provides that a disabled person is discriminated against when an entity fails to "take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services."  A plain reading of the ADA evidences that Congress intended to impose an affirmative duty on public entities to create policies or procedures to prevent discrimination based on disability.  Thus, although it is true that for claims asserted under § 1983, an official policy must be identified, the same rule cannot be reconciled with Congress's legislative objectives in enacting the ADA and the RA . . . .

*Id.* at 575.  The Court further held that "[t]here is no 'deliberate indifference' standard applicable to public entities for purposes of the ADA or the RA," but recognized that, in order to receive compensatory damages for violations of the Acts, a plaintiff must show intentional discrimination. *Id.*  Thus, in *Delano-Pyle*, the Court upheld a jury verdict finding a violation of Title II based on an individual police officer's conduct with regard to a disabled individual amounting to intentional discrimination.

### 3. Analysis

With these standards in mind, the Court turns to the parties' arguments.  Bexar County

argues that it has a policy allowing seeing eye dogs and "other guide dogs and animals used to guide or assist handicapped persons."  However, this policy does not appear to directly address individual access to the Courthouse, but rather concerns procedures and policies for persons or groups wishing to use County property, nor is there any evidence of a policy concerning how Courthouse security may determine whether an animal is a service animal.  Here, relying on Title III regulations and policies governing public accommodations, Plaintiff apparently argues that a reasonable accommodation would be to require Bexar County to allow all persons who state that they are disabled and that their dog is a service dog to access the Courthouse without any proof that the animal is a service animal.[5]  Neither party addresses whether this is a reasonable accommodation in this context, nor does either party address the extent to which the Title III regulations and interpretations should provide guidance.

Defendant further complains that Plaintiff "provides little specific information about" the incident at the security checkpoint at the Courthouse entrance, stating that Plaintiff does not identify the employees involved and "never added any of these persons as Defendants in regard to this incident."[6]  Defendant further asserts that "[a] business may ask if an animal is a service animal and what task the animal is trained to perform" and that "[t]hese questions appear to have been asked

---

[5] The Court notes that although Plaintiff apparently has a document from the Social Security administration that states that he "has a service dog that is allowed to accompany him anywhere he goes, per federal law" and a letter from a physician stating that he is "visually impaired and requires the use of a Service Dog," there is currently no evidence in the record concerning what training Prissy has received or what tasks she performs for Plaintiff.

[6] The Court notes that Plaintiff could not add an individual as a defendant to his Title II claim, because Title II does not provide for individual liability.  Defendant further complains that "Plaintiff made little attempt to determine who" these individuals were, and Bexar County "has no information to identify the specific door or the 'supervisor' who permitted Mr. Pena to enter the courthouse."  This lack of information could have easily been remedied by Bexar County through discovery, however.

the day in question and Mr. Pena was allowed to enter the Bexar County Courthouse."  Defendant then summarily asserts that "[t]he only information that Mr. Pena provides the court to support his claim is hearsay statements allegedly made by unidentified persons" and that "[w]ithout proper summary judgment evidence, plaintiff's claims in regard to this incident should be dismissed."  It is apparent, however, that any statement made by Bexar County's employees at the security entrance are not hearsay, as Plaintiff is not attempting to introduce them for their truth.  Rather, Plaintiff is asserting that the policies and procedures for admitting disabled persons with service dogs into the Courthouse are inadequate.[7]  Further, even if Bexar County has a policy allowing service dogs, if that policy is not followed, or if there is no adequate policy or procedure for determining whether a dog is a service dog as opposed to a pet so as to ensure that persons with service dogs are not discriminated against, Bexar County may be liable under Title II.

With regard to the incident on the third floor, Bexar County notes that "[a] call had been received in Bexar County Dispatch in regard to a man with a dog in the courthouse," that Officers Stanford and Hernandez, who were on the third floor, received the call, and that the Bexar County Children's Courts are on the third floor, which was "an additional concern about a dog being on this floor."  Bexar County asserts that Officers approached Plaintiff in a staff attorney's office, that the dog had no visual indications of being a service animal, and that the Officers' purpose was "to determine who Mr. Pena was, why he had a dog with him and whether that dog was any danger to the children and families on the 3rd floor."  Bexar County asserts that "[b]ecause Mr. Pena would

---

[7] With regard to the fact that Plaintiff was not allowed to sit while waiting for a supervisor, the Court notes that this would not appear to be intentional discrimination, as there is no evidence that Plaintiff ever informed the individual that he was unable to stand for long periods of time due to his disability.  However, Defendant has not moved for summary judgment on anything other than its hearsay argument.

not provide the requested information in regard to his identification and information about his service animal and because Mr. Pena was cursing and becoming angry, Mr. Pena was asked to leave the courthouse."  Bexar County asserts that "Mr. Pena refused and he was arrested for criminal trespass."  Bexar County asserts that Plaintiff had documentation with him and that "[i]f he had produced these documents to Officer Stanford, this incident would never have happened" and "if Deputy Stanford knew that the 90 pound Akita was properly trained, he would not have had to be concerned about the children and families on the 3rd floor."  Bexar County contends that "Mr. Pena's actions escalated the situation," that Plaintiff could have easily responded to the questions but was banging on the table and cursing, and that Plaintiff "fails to prove that this incident is an ADA violation."

It does appear that Plaintiff was at least partly to blame for the escalation of the situation. However, his behavior was due to the frustration at what he perceived to be an ADA violation, and the fact that he had already been delayed and questioned about his dog at the Courthouse entrance. It appears that Mr. Pena's frustration could have been avoided had Bexar County implemented and followed an adequate policy or procedure relating to service animals.  It is undisputed that Mr. Pena was only interfered with and questioned because he had a dog, which was due to his disability. Other than to blame each other, neither party adequately addresses the application of the ADA to events on the third floor and the arrest.  *See Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000).

Because the parties have not adequately briefed and argued the Title II claim, and the application of the law in this context is unclear, the Court finds that summary judgment must be denied on  Count I.

18

**B. Section 1983 claims against all Defendants**

Plaintiff alleges claims under 42 U.S.C. § 1983 against Bexar County and the Individual Defendants for violations of his rights under Title II of the ADA, the Fourth Amendment, and the Fourteenth Amendment.  Section 1983 provides a right of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983.

1. Title II of the ADA

*a. The § 1983 Claims Against the Individual Defendants for violations of Title II are Not Permitted*

Plaintiff never expressly states that he is suing the Individual Defendants in their individual capacities, but since suit against them in their official capacities would be duplicative of the claims against Bexar County, the Court assumes that Plaintiff is intending to assert claims against the Individual Defendants in their individual capacities.  However, it is technically an open question in this Circuit whether a plaintiff may sue individual defendants under § 1983 for violations of Title II.  In *Lollar v. Baker*, 196 F.3d 603 (5th Cir. 1999), the Fifth Circuit held "that section 1983 does not provide a remedy for violations of the Rehabilitation Act."  Specifically, the plaintiff was attempting to sue an individual under section 1983 for violations of the Rehabilitation Act, which does not provide a cause of action against individuals, but only for entities receiving federal funding.  The Court noted that the plaintiff "seeks to use section 1983 as a vehicle to reach Baker individually, as a person, who under color of law, has subjected Lollar to the deprivation of rights under the Rehabilitation Act."  *Id.* at 609.  The Court held that because "Congress has provided a specific comprehensive internal enforcement mechanism to protect the rights of the disabled who are

19

employed by recipients of federal funds," it would "assume that Congress intended to foreclose resort to the more general enforcement provisions of section 1983 to vindicate the rights created by the Rehabilitation Act." *Id.* at 609-10.  The Court continued:

> In rejecting section 1983 as an enforcement mechanism for rights found in the Rehabilitation Act, we join the Eleventh Circuit. In *Holbrook v. City of Alpharetta*, 112 F.3d 1522 (11th Cir.1997), the Eleventh Circuit reasoned that
>
>> both the Rehabilitation Act and the ADA provide extensive, comprehensive remedial frameworks that address every aspect of [a plaintiff's claim] under section 1983. To permit a plaintiff to sue both under the substantive statutes that set forth detailed administrative avenue of redress as well as section 1983 would be duplicative at best; in effect such a holding would provide the plaintiff with two bites at precisely the same apple. We conclude that a plaintiff may not maintain a section 1983 action in lieu of-or in addition to-a Rehabilitation Act or ADA cause of action if the only alleged deprivation is of the employee's rights created by the Rehabilitation Act and the ADA.
>
> *Holbrook*, 112 F.3d at 1531; *see also Alsbrook v. City of Maumelle*, 184 F.3d 999, 1010-11 (8th Cir. 1999) (stating "the ADA's comprehensive remedial scheme bars [the plaintiff's] section 1983 claims against the commissioners in their individual capacities").
>
> In sum, because the Rehabilitation Act by its express terms provides comprehensive enforcement and remedial measures for violations of its provisions, we hold that section 1983 cannot be used as an alternative method for the enforcement of those rights.

In *Cole v. Velasquez*, an unpublished decision, the Fifth Circuit indicated that *Lollar* would likely apply to ADA claims:

> It might be that Cole is attempting to use § 1983 as a vehicle to reach Velasquez, who, under color of law, allegedly violated-and continues to violate-his rights under the ADA. If so, our reasoning in *Lollar v. Baker*, 196 F.3d 603 (5th Cir. 1999) may support the conclusion that Cole is precluded from bringing a § 1983 action against Velasquez, in her individual capacity, in order to vindicate or enforce rights conferred upon him by Title II of the ADA.  *See Lollar*, 196 F.3d at 608-10.  In *Lollar*, we held that a disabled state employee alleging discrimination could not bring a § 1983 action against her supervisor in the supervisor's individual capacity

to enforce rights guaranteed under the Rehabilitation Act, 29 U.S.C. § 794, because the Rehabilitation Act, by its express terms, provides a comprehensive remedial scheme for the enforcement of its provisions. *See Lollar*, 196 F.3d at 608-10. In support of our holding, we cited with approval the reasoning in cases from the Eleventh and Eighth Circuits, both of which held that the ADA's comprehensive remedial scheme bars § 1983 claims against state officials in their individual capacities. *See id.* at 610 (citing *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1531 (11th Cir. 1997) and *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1010-11 (8th Cir.1999) (en banc)).

67 Fed. App'x 252 (5th Cir. 2003).  Further, in a more recent unpublished opinion, the Fifth Circuit stated that a plaintiff "may not bring a 42 U.S.C. § 1983 action for damages against a state official in his individual capacity to vindicate rights conferred by Title II of the ADA."  *Rivera v. Dawson*, 2007 WL 1223914 (5th Cir. 2007).

District courts in the Fifth Circuit have uniformly applied *Lollar* to claims under the ADA. *See, e.g.*, *DeLeon v. City of Alvin Police Dept.*, Civ. A. No. H-09-1022, 2009 WL 3762688 at *4 (S.D. Tex. Nov. 9, 2009); *Albritton v. Quarterman*, Civ. A. No. 6:08-CV-268, 2009 WL 585659 *10-11 (E.D. Tex. Mar. 6, 2009) ("Because the remedies, procedures, and rights under the Americans with Disabilities Act are the same as those under the Rehabilitation Act, there is likewise no individual liability for claims of violations under the ADA."); *Bostick v. Elders*, Civ. A. No. 2:02-CV-0291, 2003 WL 1193028 (N.D. Tex. Jan. 10, 2003) ("Because Title II relief under the ADA relies entirely upon the same statutory provision for enforcement, it appears plaintiff cannot sue the defendants in their individual capacities for relief, and cannot utilize Title 42, United States Code, section 1983 as an avenue to establish individual liability.") (citations omitted).  And other circuits have also followed suit.  *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002); *Garcia v. State Univ. of NY Health Sci. Ctr.*, 280 F.3d 98, 107 (2d Cir. 2001); *Alsbrook v. City of Maumelle*, 184 F.3d 999 (8th Cir. 1999).

Based on the weight of authority and holdings of the Fifth Circuit,[8] the Court concludes that Pena's § 1983 claims against the Individual Defendants in their individual capacities for violations of Title II are not permitted.

*b. Plaintiff's § 1983 claims against Bexar County for Title II violations*

The language in the Fifth Circuit's *Lollar* opinion, though limited by the facts to claims against individual-capacity defendants, is broad enough to preclude claims against Bexar County as well, given that the ADA already provides a comprehensive remedy against Bexar County for violations of Title II.  *See Bostick v. Elders*, Civ. A. No. 2:02-CV-0291, 2003 WL 1193028 (N.D. Tex. Jan. 10, 2003)  ("[I]n *Lollar*, the Fifth Circuit cited with approval the Eleventh Circuit holding in *Holbrook v. City of Alpharetta*, 112 F.3d 1522 (11th Cir. 1997), that section 1983 could not be utilized as an additional or alternative method for enforcement of rights covered by the comprehensive remedial scheme for claims under either the Rehabilitation Act or the ADA."); *see also Holbrook*, 112 F.3d at 1531 ("To permit a plaintiff to sue both under the substantive statutes that set forth detailed administrative avenues of redress as well as section 1983 would be duplicative at best; in effect, such a holding would provide the plaintiff with two bites at precisely the same apple."); *Gallagher v. San Diego Unified Port Dist.*, Civ. A. No. 080CV-886, 2009 WL 943860 *2 n.3 (S.D. Cal. Apr. 7, 2009).  The Court therefore concludes that Plaintiff's claims against Bexar County under section 1983 for violations of Title II are precluded by the comprehensive

---

[8] The Court notes that it appears that language in the ADA could be interpreted to reach a contrary conclusion that section 1983 claims are not foreclosed by the ADA's remedial scheme. *See* 42 U.S.C. § 12201(b) ("Nothing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any Federal law or law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter.").  However, the Court is bound to follow the decisions of the Fifth Circuit and has done so in this case.

enforcement scheme of the ADA.

In the alternative, Plaintiff's § 1983 claim against Bexar County fails insofar as Plaintiff has failed to identify a policy, custom, or practice created or sanctioned by a policymaker.  Local government units such as counties can be liable under § 1983 for civil rights violations that are "directly attributable to it 'through some official action or imprimatur.'"  *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009); *see also Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978).  Plaintiff has not provided any summary-judgment evidence demonstrating that the violations amounted to a custom or practice sanctioned by a policymaker.

### 2. Violations of the Fourth Amendment

Plaintiff claims Defendants violated "his Fourth Amendment right to be free from unlawful search and seizure."  Am. Compl. ¶ 34.  He alleges that "Defendants' actions of detaining and placing Plaintiff under arrest despite the fact that he had a right under Title II of the ADA to be accompanied by his service animal violated the Fourth Amendment.  Defendants' actions of detaining and placing Plaintiff under arrest required at least 'reasonable suspicion' that Plaintiff had committed a crime, which Defendants did not have."  *Id.* ¶ 35. Plaintiff claims that he "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer to Defendants did not, without more, furnish those grounds."  *Id.*  Plaintiff states that, ultimately, he "was arrested simply because of his refusal to leave the Bexar County Courthouse even though under Title II of the ADA he had every right to be there."  *Id.* ¶¶ 36, 51. Plaintiff also alleges that Defendants' "actions constituted the use of excessive force in violation of Plaintiff's constitutional rights."  *Id.* ¶ 35.

*a. Individual Defendants*

<u>1. excessive force</u>

To establish an excessive use of force claim, a plaintiff must demonstrate (1) an injury (2) that resulted directly and only from the use of force that was excessive to the need and (3) the force used was objectively unreasonable.  *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001).  To determine the objective reasonableness of an officer's use of force, "[w]e pay 'careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight.'"  *Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir. 2005).

Defendants move to dismiss this claim on the basis that Plaintiff "did not suffer any physical injury in regard to the alleged use of excessive force." [9]   In the Fourth Amendment context, the "injury must be more than a *de minimis* injury and must be evaluated in the context in which the force was deployed."  *Id.*  We analyze the excess force claim without regard to whether the arrest itself was justified.  *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007).  The Fifth Circuit has held that "minor, incidental injuries that occur in connection with the use of handcuffs to effectuate an arrest do not give rise to a constitutional claim for excessive force."  *Id.* (citing *Glenn*, 242 F.3d at 314).  Thus, it has held that a claim "that the deputies twisted [plaintiff's] arms behind her back

---

[9] Defendants cite *Harper v. Showers*, 174 F.3d 716, 719 (5th Cir. 1999) and *Siglar v. Hightower*, 112 F.3d 191 (5th Cir. 1997) in support of their position. *Harper* and *Siglar*, however, were both actions by inmates under the Eighth Amendment subject to the requirements of § 1997(e) of the Prison Litigation Reform Act, which provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997(e).

while handcuffing her, 'jerked her all over the carport,' and applied the handcuffs too tightly, causing bruises and marks on her wrists and arms" was *de minimis*. *Id.*

Though five officers apparently participated in Plaintiff's arrest and removal from the building, only four – Deputy Stanford, Deputy Hernandez, and Deputy Stubbs – physically interacted with Plaintiff. Deputy Stanford initially tried to handcuff Plaintiff, and Deputy Hernandez, Deputy Stubbs, and Deputy Tobleman assisted in gaining control of Plaintiff's arms when Plaintiff resisted. Deputy Rapier interacted only with the dog. Plaintiff does not deny that he actively resisted being handcuffed or that he would not let go of the dog's leash.

The Court finds that, viewed in the light most favorable to Plaintiff, the summary judgment evidence shows that any injury was *de minimis* and that the amount of force used was not excessive as a matter of law. Defendants have provided Plaintiff's interrogatory responses, in which he states that "[h]is physical injuries . . . were mostly superficial." Def. Ex. D. Plaintiff asserts that his injury was more than *de minimis* because his right arm was paralyzed, making the fact that he was lifted by his arms excruciating. However, though Plaintiff may have suffered more pain than a non-paralyzed person would have, there is no evidence that Defendants knew that his arm was paralyzed, and thus the Court finds that the Defendants' use of force was objectively reasonable in light of the fact that Plaintiff was uncooperative and refusing to leave voluntarily. Of course, if the Individual Defendants did not violate the Fourth Amendment, then Bexar County can have no liability as well. Thus, summary judgment is granted for all Defendants on Plaintiff's excessive force claim.

2. false arrest

Defendants assert that "Officer Hernandez has provided summary judgment evidence to explain his decision that there was probable cause to arrest Mr. Pena the day in question." Motion

25

at 13.  "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."  *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).  Precedent "clearly dictates [that] subjective intent, motive, or even outright animus are irrelevant in a determination of qualified immunity based on arguable probable cause to arrest, just as an officer's good intent is irrelevant when he contravenes settled law."  *Mendenhall v. Riser*, 213 F.3d 226, 231 (5th Cir. 2000).

The only crime for which the Individual Defendants could have arrested Plaintiff at the time they decided to make the arrest was criminal trespass.  Texas Penal Code section 30.05 provides that "(a) A person commits an offense if the person enters or remains on or in property of another, including residential land, agricultural land, a recreational vehicle park, a building, or an aircraft or other vehicle, without effective consent and the person: (1) had notice that the entry was forbidden; or (2) received notice to depart but failed to do so."  TEX. PENAL CODE § 30.05(a).  "Notice" means "oral or written communication by the owner or someone with apparent authority to act for the owner."  *Id.* § 30.05(b)(2).  Thus, "the offense of criminal trespass consists of the following elements: (1) a person (2) without effective consent (3) enters or remains on the property or in a building of another (4) knowingly or intentionally or recklessly (5) when he had notice that entry was forbidden or received notice to depart but failed to do so."  *Tex. Dep't of Pub. Safety v. Axt*, 292 S.W.3d 736, 740 (Tex. App.–Forth Worth 2009, no pet.).

To be entitled to qualified immunity, the Individual Defendants must have reasonably believed that Plaintiff was in the Courthouse "without effective consent" and "had received notice to depart but failed to do so."  Defendants' uncontroverted testimony establishes that Plaintiff was asked to leave the Courthouse but failed to do so.  Therefore, the dispositive inquiry is whether the

Defendants reasonably believed that Plaintiff was in the Courthouse without effective consent.

Plaintiff asserts that Defendants did not have reasonable suspicion to detain him in the first place because the fact that he was already inside the Courthouse should have generated an initial assumption that he had already submitted to an administrative search through a security checkpoint and that his dog had already been determined to be a service animal.  However, the undisputed evidence is that Defendants received a call from dispatch regarding a man with a dog in the Courthouse.  This fact is enough to negate the presumption that Defendants should have concluded that Plaintiff had been determined to be lawfully present with his dog, and gave Defendants a reasonable suspicion that Plaintiff was possibly not authorized to be there, sufficient to allow them to question Plaintiff.  Whether Plaintiff did have a service dog and was entitled to be in the Courthouse with the dog is not the question[10]; rather, the question is whether Officer Stanford, who made the decision to arrest, had reason to believe that the animal was not a service dog and thus was in the Courthouse in violation of Bexar County policy and without effective consent.  The evidence is that Plaintiff informed Officer Stanford that he was disabled and that the dog was a service dog.  However, Officer Stanford testified that the dog had no visible indicia associated with service dogs, such as a vest or harness.  And, it appears that Plaintiff has no obvious disability that would have lead Defendants to believe that the dog was a service dog.  There is no evidence that Plaintiff provided any documentation to Defendant Sanford.  Further, the uncontroverted summary judgment evidence is that Plaintiff refused to provide identification.[11]

---

[10] Though Plaintiff asserts that the Courthouse is public property and that he had a right to be there, one can trespass on public property.  *Allen v. State*, 2003 WL 1090366 (Tex. App. – Tyler March 12, 2003).  Further, it is undisputed that public access to the Courthouse is not unrestricted.

[11] In his Response to the Motion for Summary Judgment, Plaintiff asserts that he did "identify himself first at the security entrance to the Courthouse (*i.e.*, to Defendant John Doe 1) and

"Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *United States v. Levine*, 80 F.3d 129, 132 (5th Cir. 1996). Even if probable cause does not exist, qualified immunity protects officers who "reasonably but mistakenly" violate a plaintiff's rights. *Freeman v. Gore*, 483 F.3d 404, 415 (5th Cir. 2007). The Court finds that Defendant Stanford and the other Defendants reasonably perceived that Plaintiff was in the Courthouse "without effective consent." Thus, they are entitled to qualified immunity.

Further, Plaintiff's true complaint is that Defendants mistakenly arrested him for trespass because they were unfamiliar with the ADA's requirements and violated the ADA in their interactions with him, which he opposed. Thus, allowing Plaintiff to proceed on this claim under § 1983 would in effect allow Plaintiff to bring his ADA claim against the Defendants in their individual capacities, because Plaintiff's real complaint is the violation of the ADA. That is simply another avenue for attempting to reach the Individual Defendants for violations of the ADA, which this Court has already found precluded. The Individual Defendants are granted summary judgment on this claim.

*b. Bexar County*

Plaintiff alleges in his Amended Complaint that Bexar County "sanctioned customs, practices and/or policies and procedures" and "Bexar County's actions were a customary practice

---

also when confronted by the other Individual Defendants . . . . As already detailed in his Declaration, Plaintiff, in addition to his Texas State I.D., produced a document from the Social Security Administration to corroborate both his disability and the fact that he relied upon a service animal." However, his Declaration does not state that he provided identification or documentation to the Individual Defendants during the encounter on the third floor. Thus, the only competent summary judgment evidence is that Plaintiff did not provide identification or documentation to the Individual Defendants during the third floor encounter.

and/or policy or procedure that were sanctioned by Defendant Bexar County, Texas, out of which deprived Plaintiff of his civil rights." Am. Compl. ¶ 37.  Plaintiff also alleges that liability may be established because "such actions are a persistent, widespread practice of [Bexar County's] employees that, although not authorized by officially-adopted policy, is so common and well-settled as to constitute a custom that fairly represents official policy." Am. Compl. ¶ 38.  Plaintiff alleges that Bexar County "had actual or constructive knowledge of this practice, custom, and/or policy or procedure and sufficiently numerous prior incidents establishes customs and accession to that custom by Defendant Bexar County, Texas' policy makers" and that Bexar County's "actions reflect deliberate indifference to the risk that a violation of a particular constitutional or statutory rights will follow." *Id.*  Bexar County moves for summary judgment on the basis that Plaintiff has failed to show that a policy or custom caused the alleged constitutional violation.[12]

There is no respondeat superior liability of a county for its employee's negligent or grossly negligent conduct. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978).  As such, Plaintiff may prevail against Bexar County only if he can demonstrate (1) the existence of an official custom or policy, which is satisfied if the conduct of Bexar County employees is so persistent and widespread that it rises to the level of custom and a policymaker actually or constructively knew about the custom, or (2) as a result of its deliberate indifference, Bexar County failed to adequately train its employees. *See DeShay v. Bastrop Ind. Sch. Dist.*, 180 F.3d 262 (5th Cir. 1999).  Though Plaintiff made conclusory allegations in his Amended Complaint regarding these requirements, Plaintiff offers no summary judgment evidence concerning either.  Accordingly, the Court finds that

---

[12] The Court notes that this argument is contained within the section addressing Plaintiff's excessive force claims.  Bexar County does not expressly move for summary judgment on this basis with regard to the false arrest claim.

Bexar County is entitled to summary judgment on Plaintiff's Fourth Amendment excessive force claims.

### 3. Violations of the Fourteenth Amendment

Plaintiff claims that Defendants violated "his Fourteenth Amendment substantive and procedural due process rights to liberty, health, and safety, and bodily integrity and to a safe environment protecting him from violations of his rights by state actors."  Am. Compl. ¶ 34. Plaintiff claims his "right to be free of state-occasioned damage to his body and bodily integrity is protected by the Fourteenth Amendment guarantee of due process." *Id.* ¶ 35.  He further alleges that his "right to a meaningful, fair, and impartial hearing is protected by the Fourteenth Amendment guarantee of due process" and that Defendants "abrogated this right by failing to provide a mechanism or procedure to determine whether the deprivation of Plaintiff's liberty was legal – particularly given the fact that plaintiff had provided documentation from the Social Security Administration indicating that he was both disabled and required the use of a service dog." *Id.* Plaintiff asserts that he has "both procedural and substantive due process rights of protections against violations by Defendants." Further, Plaintiff claims that Defendants' "action of seeking to impose punishment upon Plaintiff without criminal adjudication represents a clear violation of the Due Process Clause of the Fourteenth Amendment."

Though Plaintiff alleges that "[a] cause of action is stated under the Fourteenth Amendment for violation of due process for failure to adhere to the requirements of the Fourth Amendment," Am. Compl. ¶ 44, this position has been rejected by the Supreme Court and Fifth Circuit. *Reynolds v. New Orleans City*, 272 Fed. App'x 331 (5th Cir. 2008).  Thus, the Fourteenth Amendment claims stemming from the arrest and detention are properly considered only under the Fourth Amendment.

30

To the extent Plaintiff is complaining that he was improperly charged with trespassing, resisting arrest, and animal cruelty without due process, "causing charges to be filed without probable cause will not without more violate the Constitution." *Castellano v. Fragozo*, 352 F.3d 939, 945 (5th Cir. 2003) (holding that "no such freestanding constitutional right to be free from malicious prosecution exists"). "There is no federal constitutional claim based on the tort of malicious prosecution." *Jackson v. Mizzel*, 361 Fed. App'x 622 (5th Cir. 2010). Plaintiff alleges no deprivation of due process related to the charges other than the fact that the charges were filed, and thus this claim fails as a matter of law.

Accordingly, summary judgment is granted in favor of all Defendants on Plaintiff's claims based on violations of the Fourteenth Amendment.

### C. State-Law Negligent Training and Supervision Claim against Bexar County

In Count XI, Plaintiff alleges that Bexar County "negligently trained and supervised its employees who violated Plaintiff's rights [under] the Americans with Disabilities Act." Am. Compl. ¶ 61. Plaintiff alleges that "Bexar County possesses a duty to employees to exercise reasonable care to ensure its employees with supervisory authority are properly trained, and supervised" and "to ensure that its Deputies will not, for instance, abridge the constitutional rights of persons like Plaintiff." Plaintiff asserts that Bexar County, through its negligent acts and omissions, proximately caused actions to be taken against Plaintiff and Plaintiff has suffered irreparable injury and monetary damages as a result.

Defendant Bexar County does not expressly move for summary judgment on this state-law claim. Rather, Defendant apparently perceives this claim to be brought under Section 1983. However, the location of the claim among the other state-law claims instead of within the section

1983 claim, as well as the use of the terms "negligence" and proximate cause, make clear that Plaintiff is bringing this claim under Texas common law, not section 1983.

Bexar County states that it "has asserted sovereign immunity" and "[t]herefore, Plaintiff's state law claims arising out of assault, false imprisonment and any other intentional tort are barred." However, it never expressly moves for summary judgment or dismissal of this negligence claim on the basis of sovereign immunity. The Court concludes that this is likely an oversight, as this claim would appear to be barred by sovereign immunity. The Texas Tort Claims Act establishes a waiver of governmental immunity for "personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." TEX. CIV. PRAC. & REM. CODE § 101.021(2). Plaintiff's negligence claim does not involve "a condition or use of tangible personal or real property." However, as noted, Bexar County has not moved for summary judgment on this issue, and thus this claim remains pending.

### Conclusion and Order to Mediate

Defendants' Motion for Summary Judgment (docket no. 34) is GRANTED IN PART, DENIED IN PART, and DISMISSED AS MOOT IN PART as discussed herein. Two claims remain pending against Bexar County – violation of Title II of the ADA and state-law negligent training and supervision. No claims remain against the Individual Defendants.

Based on the evidence presented, it appears that both parties are partly to blame for the unfortunate events that transpired. Further, the law in this area is somewhat unsettled, and neither party has adequately briefed or argued the Title II claim. The Court concludes that mediation of the remaining claims before Magistrate Judge Nowak would be in the best interests of both parties. The

Court will issue a separate mediation order.

It is so ORDERED.

SIGNED this 21st day of June, 2010.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE